# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01064-COA

**REVERIE BOUTIQUE LLC**                                                              **APPELLANT**

**v.**

**CITY OF WAYNESBORO, MISSISSIPPI**                                            **APPELLEE**

DATE OF JUDGMENT:                 07/02/2018
TRIAL JUDGE:                             HON. LESTER F. WILLIAMSON JR.
COURT FROM WHICH APPEALED:  WAYNE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      JOHN RAY GUNN
                                               PATRICK H. ZACHARY
ATTORNEYS FOR APPELLEE:        WILLIAM ROBERT ALLEN
                                               JESSICA SUSAN MALONE
NATURE OF THE CASE:               CIVIL - PROPERTY DAMAGE
DISPOSITION:                            REVERSED AND REMANDED - 10/29/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    Reverie Boutique was flooded by sewage and alleged that it had lost tens of thousands of dollars of inventory because of it.  The business sued the City of Waynesboro based on the premise that it was negligent in maintaining its sewer.  The City conceded that for decades it had known of breakdowns in the sewage system, never corrected them, and lacked a written maintenance plan, but the City maintained that this was within its discretion.

¶2.    The trial court found that the City was immune from suit and granted summary judgment.  But just a few days before that ruling, the Mississippi Supreme Court overhauled the test to determine when negligence suits like this one could go to trial.

¶3.     In light of the intervening change in the law, we reverse and remand.

**FACTS**

¶4.     The core facts of this case are not in dispute. Reverie Boutique was a family business owned by three women—two aunts and a niece. The store, located on Wayne Street in downtown Waynesboro, offered clothing and furniture. In the few years it had been in business, Reverie's owners had never had any problems with the toilets or sewer or even had to call a plumber, and no one could remember the location having problems before they moved in.

¶5.     One week in 2015, the storeowners traveled to Dallas to purchase inventory. There were heavy rains that week in Wayne County. The store's salesclerk went in to open Reverie on Friday morning. After opening the door, she stepped in a puddle. The store was filled with wastewater. The sewer system had backed up, flooding the store with sewage. The backflow had come up from the boutique's toilets, which brought with it toilet paper, grass, rocks, and dirt.

¶6.     The City responded by bringing a pump truck to force pressure through the pipes. After opening a manhole in front of the store, several city employees saw a commercial mophead shoot through the pipe, never to be seen again.

¶7.     By the time of the foul flood in 2015, parts of the aging sewer system had been crumbling for decades. The sewer was intended to be a closed sanitary system; it was only intended to contain what was flushed into it by the homes and businesses of Waynesboro. That refuse would then flow through pipes to a local treatment center, which was permitted

2

to process 2.25 million gallons of sewer waste a day.

¶8. Although this was the idea, it had not worked like this for many years. There was testimony that the original pipes of the sewer system were made out of clay, and sometimes concrete, and were eight inches in diameter. Over the decades, the noxious gases from the waste in the sewer would cause the pipes to sometimes completely disintegrate.

¶9. A former public-works director Joseph Walley explained that "when they put sewer lines in back in the '40s and '50s, they thought it was the best thing in the world. And then they found out the sewer gas eats the line out of the concrete, and we would dig them up and actually just have a trough the water would run in." In place of full pipes running through the sewer system, "[t]here would be nothing on top other than an open hole." This blank space would occasionally collapse like a miniature cave-in.

¶10. When the crumbling happened and was discovered, the City would "dig the pipe up and replace . . . the section till you got back to where there was a section you could tie into" with structurally sound pipe, according to Walley. "Sometimes it might be ten feet," and "[s]ometimes it might be a hundred feet." The City would dig until it found a stable section of pipe and then replace it with a thick PVC pipe. Another former public-works director Harvey Hull described the replacement pipe as "some of the best they got on the market now." Even when parts of a pipe might be missing, Hull explained the sewer might still generally carry wastewater because "the dirt will form what you have left up there," unless the pipe was put under heavy pressure.

¶11. In addition to the concentrated sewer gas, the City struggled against nature's growth.

3

Roots were a problem for the clay and concrete pipes because the inexorable growth of trees and plants downward would intrude upon pipes, crack them, and then keep going. According to Walley, this was the primary problem because the City would "have to pull out sections of roots and then replace the lines after we got the roots out."

¶12.   There was also the strain of population and business growth. More and more houses and businesses were hooked into the aging system, so even more waste was being pushed through pipes that had remained the same size since installation.

¶13.   So even though the system was built to be a closed sanitary system, over years of natural decay and natural intrusion, it no longer worked that way. Multiple city workers testified that in their careers they had spotted various foreign objects in the "closed system"—inorganic matter like basketballs, bottles, and cans, and organic matter like turtles, snakes, frogs, and fish. These visitors could only come through breaches in the ideally closed system.

¶14.   All parties agreed that one problem was runoff water from rain, or stormwater. One blunt way a city worker explained how to tell if there was stormwater in the drains was that the flow would run clear—since of course normally it would be a dark color. Waynesboro had a long history of the sewer system's manholes "boiling over" and coming up from the clogged pipes below. Even before Walley began working for the City in the late 1970s he remembered a manhole running over. In this way the manholes had been acting as release valves for an overfilled sewer, jammed with excess.

¶15.   The City even had a measurement of just how over-filled the ideally closed sanitary

system could get. The supervisor of the wastewater treatment plant, Rodney Parker, explained that the City's permit allows for a flow of 2.25 million gallons a day. On a usual day, the flow was only about 800,000 gallons, which was well under the permit. But if there was "heavy rain" for a couple of days, the flow would "jump up to five million gallons[.]" It could be higher than that, but the flow meters could not calculate above a certain measurement. The plant supervisor explained, "I've had it so high we couldn't record it." Because this was a violation of their treatment permit, the Mississippi Department of Environmental Quality (MDEQ) had notified the plant and sent letters to the mayor but had never threatened to fine the City over the excess.

¶16.    In the past, the City had tried to find the infiltration points. It had conducted a smoke test, pumping smoke through the pipes and hoping to see it puff out aboveground. At the same time, it ran cameras underground to try to find the breaks. Its efforts failed, and the stormwater and other objects continued to infiltrate the closed system.

¶17.    Everyone agreed that the City did not have a written maintenance plan for the sewer. Another former public-works director Martin Stadalis explained that in his tenure, the City commenced an ad hoc plan to check the manholes. By pulling the heavy manhole covers, workers could see if the flow was stopped or disrupted in the hopes of catching problems.

¶18.    There were various estimates in the testimony that the City had anywhere from four or five hundred to one thousand manholes, although some had been paved over. Stadalis said they would perform daily checks on the manholes that caused "grief, pain and agony"—those where the system was known to have problems. His successor, Walley, would then continue

5

to check an estimated fifteen to twenty manholes a day.

¶19.    One of those problem manholes was in front of Reverie Boutique. Former assistant public-works director Steve Miller described that they had replaced up to 1,200 feet of sewer system pipe up the road from the store's location on Wayne Street. It was Miller who diagnosed that the mophead had jammed the sewer line, causing the backup into the family store. No one knew just where the mophead got into the closed sewer, just that it had, in the same way the millions of gallons of stormwater, or turtles, rocks, and fish also entered the system.

¶20.    After dragging out the ruined carpet and inventory, Reverie asked the City to cover their losses. The City's insurer declined. One of the owners would later testify that her store was "destroyed" by the sewage. "[W]e lost a lot of money and didn't recover from it," she said, and "eventually lost our business." The boutique was sold off, and some of the former owners even moved away.

## PROCEDURAL HISTORY

¶21.    Reverie eventually sued its home city of Waynesboro. The three-page complaint was succinct: it alleged solely that "the City was negligent in that it did not properly operate, maintain, and/or repair the sanitary sewer system along Wayne Street where Reverie is located." In its argument for why the City was negligent, the business claimed that Waynesboro had violated "MDEQ Regulations and Permits as well as the Federal Clean Water Act," and cited to a Mississippi Supreme Court case, *Boroujerdi v. City of Starkville*, 158 So. 3d 1106 (Miss. 2015).

¶22. The parties undertook discovery related to the issue of whether the City was immune under the Mississippi Tort Claims Act (MTCA). Reverie's former owners were deposed, as well as the salesclerk. Many current and former city employees also testified via deposition or provided affidavits.

¶23. This detailed evidence was presented to the trial court as a basis for the City's request for summary judgment, arguing that it was completely immune from suit under the theory and evidence presented. The arguments were well briefed and thoughtfully based on Mississippi law as it stood at the time, centered on the two-part test in *Brantley v. City of Horn Lake*, 152 So. 3d 1106 (Miss. 2014), and a discussion of *Boroujerdi*. The trial court conducted a hearing on the motion for summary judgment on May 9, 2018.

¶24. Critically, just two weeks later, the Supreme Court completely transformed the test for municipal liability under the MTCA in *Wilcher v. Lincoln County Board of Supervisors & City of Brookhaven*, 243 So. 3d 177 (Miss. 2018). The parties did not alert the trial court about the ruling. *Wilcher* explicitly overruled *Brantley*, and by implication *Boroujerdi*. In a detailed order, the trial court granted summary judgment on July 2, a little more than a month after the Supreme Court overruled the *Brantley* line of cases. The order did not cite to *Wilcher* but instead relied upon *Brantley* and *Boroujerdi* for the basis for dismissal.

¶25. The parties did not seek reconsideration but instead filed a notice of appeal. The Supreme Court assigned the case to this Court. In light of the change in law and further guidance on the liability of municipalities in negligent maintenance claims, we reverse and remand.

7

## STANDARD OF REVIEW

¶26.    "The grant or denial of a motion for summary judgment is reviewed de novo." *Estate of Hudson v. Yazoo City*, 246 So. 3d 872, 876 (¶29) (Miss. 2018).  "The evidence is viewed in the light most favorable to the party opposing the motion."  *Id.*  "Only if there is no genuine issue of material fact is the moving party entitled to summary judgment as a matter of law."  *Id.*  "Questions of law, which include proper application of the MTCA, also are reviewed de novo."  *Id.*

## DISCUSSION

¶27.    The one core issue in this appeal is whether Waynesboro was properly granted summary judgment as immune under the MTCA.  To determine if a government defendant is immune from suit, we use a public-policy function test.  *Wilcher*, 243 So. 3d at 187 (¶30).  First we determine "if the activity in question involved an element of choice or judgment."  *Id.*  "If so, this Court also must decide whether that choice or judgment involved social, economic, or political-policy considerations."  *Id.*  "Only when both parts of the test are met does a government defendant enjoy discretionary-function immunity."  *Id.*

### I.    It is discretionary whether to construct a sewer.

¶28.    First we turn to whether there was an element of choice in creating the sewer.  The Legislature has vested cities with the discretion to create sewers and treatment plants.  Miss. Code Ann. § 21-27-189 (Rev. 2015) ("A municipality . . . is authorized and empowered, in the discretion of its governmental authorities, to exercise the following powers and authority . . . .").  One of these powers is that a municipality may "construct, operate[,] and maintain

8

sewerage systems, sewage treatment facilities[,] and sewage disposal systems in the manner and to the extent required by the metropolitan area plan." § 21-27-189(b).

¶29. The Code is plain that municipalities have the discretion to create a sewer system, and so the first prong of the public-policy test is met.

## II. The MTCA does not bar negligence claims based on maintenance.

¶30. To analyze the second prong, we must dive deeper into the practical effect *Wilcher* had in not just restoring the public-policy test, but clarifying that claims for negligence were not automatically rendered immune. This is best shown by deeply analyzing the test from earlier this year in a case where a woman died after an unsecured gate speared her car. *Bailey v. City of Pearl*, 2018-CA-01325-COA, 2019 WL 3423383, at *1 (¶2) (Miss. Ct. App. July 30, 2019). The husband of the woman sued the city which owned the gate, claiming in part that it was not properly maintained. *Id*. at *1 (¶3). While affirming that certain causes of action were barred under the MTCA, this Court reversed the trial court's dismissal of certain negligence-based claims that were "not exempt under the public-policy function test of discretionary immunity . . . ." *Id*. at *8 (¶23).

¶31. The reversal in *Bailey* was pursuant to a careful application of *Wilcher*, which explicitly incorporated a dissent by former Chief Justice Waller in a prior MTCA case as binding precedent. *Wilcher*, 243 So. 3d at 188 (¶33) ("[W]e agree with and adopt as part of our public-policy function analysis Chief Justice Waller's dissent" in *Pratt v. Gulfport-Biloxi Regional Airport Authority*, 97 So. 3d 68, 76-77 (¶¶21-28) (Miss. 2012)). The *Pratt* dissent had forcefully argued that "simple acts of negligence which injure innocent citizens" were

not immune under the MTCA. *Pratt*, 97 So. 3d at 76 (¶23) (Waller, C.J., dissenting). Even "[t]he United States Supreme Court has made it clear that maintenance decisions such as the one at issue today do not involve policy considerations." *Id*. at 77 (¶26) (Waller, C.J., dissenting). By its clear language, the Mississippi Supreme Court declared this language as law. *Wilcher*, 243 So. 3d at 188 (¶33).

¶32. As a consequence, we held in *Bailey* that "basic maintenance decisions do not involve policy considerations and are thus not discretionary." *Bailey*, 2019 WL 3423383, at *5 (¶13). So even though the city may have had the discretionary authority to build a park, it could not claim total immunity simply because the first prong was met. *Id*. at *6 (¶15). "Here the activity in question is not the city's policy decision to create a park," which was covered by the first prong of the test, but "rather the activity was an alleged failure to secure or maintain a gate in that park." *Id*. Finding that *Wilcher* explicitly allowed such claims to move forward, we reversed the trial court's judgment and remanded the case for further proceedings. *Id*. at *8 (¶¶21-23).

¶33. It also did not matter that there was pre-2018 precedent which found negligent maintenance claims were barred, since "*Wilcher*'s adoption of the *Pratt* dissent overrules those maintenance cases." *Id*. at *7 (¶20). To closely hew to precedent, we ruled that "although it is true that a plaintiff must allege specific acts of negligence not related to or flowing from a social, economic, or political policy, merely saying that maintenance costs money does not make the failure to provide it an 'economic policy' decision." *Id*. A deeper consideration of the second prong was required. *Id*.

¶34.    The same deeper consideration is warranted in this case.  The facts within this record are not in dispute.  The boutique owners established that the sewer system was supposed to be closed, but over the years many foreign objects had been found within it, such as turtles and basketballs.  In the owners' view, the mophead that jammed up the pipe in front of Reverie was foreseeable.  Likewise, the reality that the pipes on the street had issues was well known because several hundred feet had been replaced on that same line.  The City also admitted it regularly checked the manhole right in front of the store because it had displayed problems in the past.  The storeowners also pointed to the lack of a written maintenance plan and the City's intermittent attempts to find the known breaks in the system—and the seeming abandonment of any attempts to find the breaks or infiltration points.  The City did not dispute that during heavy rains, the flow from the sewer system to the treatment plant would leap from 800,000 gallons to 5 million, a six times increase over the normal flow and more than double the MDEQ permitted treatment flow.

¶35.    In response, the City offered that it had limited resources to deal with its aging infrastructure and had been running in the red; to entirely replace all the known problem areas would be financially impossible.[1]  Waynesboro pointed out that it had checked the troubled manhole in front of Reverie daily, which it had done for years, in order to catch any problems before they got out of hand.  The City pointed to the conceded fact that the business had never had a single drop of wastewater in the store before and had never even had to call a plumber before the day the store flooded.  In the City's view, no sewer system could be

---

[1] The ramifications of this argument are further explored in the separate opinion by Presiding Judge Wilson.

11

perfect, and the mophead was foreign to the system and certainly not introduced purposefully by any action of the City.

¶36. At oral argument, counsel for Reverie argued that the negligence was plain from the face of the record, resting upon the idea that the City had taken only reactive, not proactive, measures toward maintaining its aging sewer system. Conversely, counsel for the City welcomed the application of *Wilcher*, arguing that we could also find enough in the record to affirm, despite the claim that this was a basic failure to perform maintenance. Counsel for the City also argued that it would have other defenses available to it under the MTCA, even though the trial court had not addressed them. Both sides conceded that the focus of their arguments in the trial court and in conducting discovery had not been focused on basic maintenance decisions because this was not the crux of the *Brantley* test then in place.

¶37. In overruling the test applied by the trial court in this case, the Supreme Court lamented that it had led to a complexity of pleadings and proof because "[p]arties are now citing *Brantley* to bring actions based solely on violations of statutes and/or local ordinances or regulations, which they argue impose 'ministerial' duties." *Wilcher*, 243 So. 3d at 184 (¶17). So instead of the plaintiff seeking "a common-law premises-based claim of failure to warn of a dangerous condition created by the County and City," he pursued a "statutory duty that most closely fit the factual scenario" in order "to establish a claim that, should the broader statutory function be discretionary, the defendants still had violated mandatory regulatory duties." *Id*. at 185 (¶22). "In other words, even though Wilcher's allegations

12

support an obvious common-law negligence claim against the defendants, under *Brantley*, he was forced to present his claim as a statutory and/or regulatory violation." *Id*.

¶38. This is very similar to what occurred here. Reverie's complaint began as a simple failure-to-maintain action, but the litigation ended focusing heavily on the City's sewer ordinance, the permit for wastewater treatment, and MDEQ's efforts to cite the City.

¶39. The better route is to remand for the parties to properly focus on the claim for failure of basic maintenance pursuant to *Wilcher*. First, as set out above, such a claim is explicitly authorized now pursuant to *Wilcher* and *Bailey*. Second, the Supreme Court has allowed parties a second opportunity to plead and pursue their claim in light of the complete change in the law.

¶40. This route was first addressed in *Wilcher* itself; the Supreme Court determined that "if there are any deficiencies in Wilcher's complaint, [the Supreme] Court must shoulder the blame," finding "it would be patently unfair to affirm dismissal in the County's and City's favor without Wilcher's having an opportunity to attempt to conform his complaint and proof to this Court's current approach to discretionary function immunity." *Id.* at 185.

¶41. In the immediate aftermath of *Wilcher*, the Supreme Court also allowed another MTCA claim to move forward on remand. A mother had sued a city for the death of her small child in a flood, which she attributed to the failure to properly maintain drainage in the neighborhood. *Hudson*, 246 So. 3d at 873 (¶1). The trial court "granted summary judgment in favor of Yazoo City, finding that the City [was] immune from liability because the

13

maintenance of drainage ditches [was] a discretionary function, and also because the ditch was an open and obvious danger." *Id*. at 876 (¶25).

¶42. The Supreme Court reversed the trial court's decision to grant summary judgment related to the negligence claim so it could be viewed through the lens of *Wilcher*. *Id*. at 880 (¶51). Further proceedings were warranted because "the Estate also alleged in its complaint that the Seventh Street drainage ditch constituted a dangerous condition because Yazoo City had failed to properly maintain the ditch by keeping it free of vegetation, trash[,] and debris," as "[t]his claim is predicated on ordinary negligence . . . ." *Id*. at 880 (¶49). "Given that the Estate's case was still pending when *Wilcher* handed down, overruling the *Brantley* test and reinstituting the public-policy function test for purposes of Section 11-46-9(1)(d), the applicability of subsection (d) must be decided under the reinstituted public-policy function test." *Id*. at (¶51). "And out of fairness to the Estate, we find the Estate should be allowed the opportunity to fully present its negligence claim, beyond its reliance on the overruled *Brantley* test." *Id*.

¶43. Just as in *Wilcher* and *Hudson*, the case here was soaked through with the now-overruled *Brantley* test. The complaint itself cited to a now-overruled case that was based on the *Brantley* test, and the store heavily focused its claim of action on "finding" a ministerial duty which it could allege that the City breached—whether it was a city sewer ordinance, MDEQ permit for the treatment plant, or the like. As in *Hudson*, the store's core claim for general negligence stood in second place behind its focus on a claim for a breach of ministerial duty.

14

¶44. Given the Supreme Court's guidance in those two cases, reversal and remand is proper. As we explained in *Bailey*, "[w]e must distinguish between *real policy decisions* implicating governmental functions and *simple acts of negligence* that injure citizens." *Bailey*, 2019 WL 3423383, at \*6 (¶16). While the record in this appeal contains a lot of information, Reverie should be allowed to restate its claim in light of *Wilcher*. *See Hudson*, 246 So. 3d at 880 (¶51).

¶45. The necessity of this approach is heightened given that *Wilcher* was handed down after immunity-related discovery had closed, while the motion for summary judgment was pending, after the parties had presented argument in a hearing before the trial court, and a few weeks before the trial court granted summary judgment relying upon *Brantley*. Because of this unusual timing, the incorrect test was used in granting summary judgment.

¶46. Not every intervening change in the law will warrant reversal. Given the shift back to the public-policy test, and the renewed viability of claims for negligence, reversal and remand will guarantee all parties the application of current law to their claims and defenses.

¶47. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., GREENLEE, TINDELL AND C. WILSON, JJ.; McDONALD, J., JOINS IN PART.**

**J. WILSON, P.J., CONCURRING:**

¶48. It is evident that a significant part of Reverie's claim to this point cannot survive under the public-policy function test. During oral argument in this Court, Reverie faulted the City for taking a "piecemeal" or "reactive" approach to replacing its aging sewer system.

15

Reverie argued that the City should have taken a more "proactive" approach and should have replaced the sewer line "in its entirety." Reverie complained that the City "failed to prioritize" this issue. According to Reverie, the City "prioritized [other] things that, in [Reverie's] opinion, [the City] should not have" prioritized because "there were more pressing matters inside the City, and this old sewer line [was] one of them." Reverie claimed that employees in the City's public works department warned that "something needed to be done" about the sewer system, but the City's leadership failed to heed the warnings. Reverie further asserted that at some point "a plan [was] drawn up" to fix or improve the sewer system, "but no money was ever found to put the plan in motion." In the circuit court, Reverie also alleged and complained that the City spent money to build a new "splash pad" instead of devoting resources to fixing its sewer system.

¶49. These complaints all concern "policy decisions" made by the City through its elected leaders, which cannot give rise to liability under the public-policy function test. *Wilcher v. Lincoln Cty. Bd. of Supervisors & City of Brookhaven*, 243 So. 3d 177, 182 (¶11) (Miss. 2018). The wisdom of the City's decisions is irrelevant for purposes of the MTCA. A municipality's decision to spend tax dollars on a new splash pad instead of aging infrastructure is not an actionable tort under the MTCA. "This is because the purpose of the [discretionary-function] exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* (quotation marks omitted).

¶50. The Supreme Court previously applied the public-policy function test in another case

16

involving flooding from a sewage backup. *See Fortenberry v. City of Jackson*, 71 So. 3d 1196 (Miss. 2011).[2] In *Fortenberry*, two families sued the City of Jackson for damage caused by raw sewage backing up into their homes, but the circuit court held that City was immune from liability under the MTCA because "the operation and maintenance of the City's sewage system was a discretionary function." *Fortenberry*, 71 So. 3d at 1198 (¶¶3-4).

¶51. On appeal, the Supreme Court affirmed the circuit court's order granting summary judgment, *id.* at 1204 (¶26), but produced no majority opinion. Justice Pierce's lead opinion, joined by three other justices, concluded that the City was immune from liability because its "decision to operate and maintain its sewage system [was] discretionary." *Id.* The lead opinion reasoned, inter alia, that the City's operation and maintenance of its sewer system was "an exercise of public policy" and that it was "relate[d] to economic policy, because the City must have the funds necessary to operate and maintain its sewage system." *Id.* at 1202 (¶¶17, 19). The lead opinion emphasized:

> Municipalities regularly are faced with the tough decision to maintain and repair their sewage systems or to replace the systems and incur higher costs. In their attempts to be stewards of taxpayer dollars and sewage fees, municipalities often are forced to use their discretion in deciding to repair or replace their sewer lines.

*Id.* at (¶19). A fifth justice concurred in the result only without separate opinion.

¶52. Justice Randolph, joined by three other justices, dissented. The dissent agreed with

---

[2] *Fortenberry* was overruled when the Supreme Court abandoned the public-policy function test. *See City of Magee v. Jones*, 161 So. 3d 1047, 1050 (¶9) (Miss. 2015) (stating that *Fortenberry* applied the "two-pronged public-policy function test," which had "since been overruled" in *Brantley v. City of Horn Lake*, 152 So. 3d 1106, 1112 (¶19) (Miss. 2014)). However, as the majority discusses, the Supreme Court has now overruled *Brantley* and re-adopted the public-policy function test.

17

the lead opinion that

> [i]n some instances, the City's operation and maintenance actions will involve an element of choice or judgment which implicates social, economic or political policy alternatives. For example, the municipality's annual budgeting meetings addressing system improvements would likely be discretionary. . . . This Court will not mandate which particular sewage pipes the City should fix, and what amount of monies it should expend on its sewage repair.

*Id.* at 1205 (¶31) (Randolph, J., dissenting) (citation, quotation marks, and alterations omitted). However, the dissent argued that the lead opinion "paint[ed] with too broad a brush" by "foreclosing the possibility that any . . . of the City's operation and maintenance decisions involving its sewage system may be ministerial." *Id.* at 1206 (¶31). The dissent reasoned that "[s]urely, many day-to-day operation and maintenance decisions [could] be ministerial." *Id.*

¶53. Although *Fortenberry* did not produce a majority opinion, there was some common ground among the eight justices who joined the lead opinion or the dissent. There was apparent agreement that a municipality cannot be held liable under the MTCA for making budget decisions or allocating scarce resources. In addition, a municipality cannot be held liable for not replacing particular pipes or for not spending enough on replacements or repairs. *Id.* at 1205 (¶31). Such policy decisions are immune from liability under the public-policy function test and the discretionary-function exemption. As discussed above, this applies to a number of the arguments advanced by Reverie in this case.

¶54. With these observations, I concur that the case should be remanded to give Reverie an opportunity to establish a claim for ordinary negligence under the recently re-adopted public-policy function test. As the majority opinion discusses, that is what the Supreme

18

Court did in *Estate of Hudson v. Yazoo City*, 246 So. 3d 872 (Miss. 2018), a post-*Wilcher* case in which the estate of a deceased child alleged that a city's violation of ordinances and regulations related to its drainage system had caused a ditch to flood, which resulted in the child's death. *Id.* at 873 (¶¶1-2). The Supreme Court held that the estate's allegations that the city had violated ordinances and regulations failed as a matter of law. *Id.* at 880 (¶48). However, in "fairness to the [e]state," the Court remanded the case to give the give the estate an opportunity to develop its claim that the city "failed to properly maintain the ditch by keeping it free of vegetation, trash, and debris." *Id.* at (¶51). The Court stated that such a claim sounded in "ordinary negligence" and was "entirely different" from the estate's theory of liability based on ordinances and regulations. *Id.* at (¶49).

¶55.	Reverie should have the same opportunity to re-frame their case in light of *Wilcher*. However, under the public-policy function test, Reverie will have to show that its damages were caused by some specific "ordinary negligence" of the City's public works employees in their day-to-day operation and maintenance of the City's sewer system. *Id.*; *see Fortenberry*, 71 So. 3d at 1205-06 (¶31) (Randolph, J., dissenting). Reverie's broader complaints that the City should have spent more money on the sewer system or should have prioritized infrastructure over some other project all implicate policy decisions and therefore fail as a matter of law.

**BARNES, C.J., GREENLEE, TINDELL AND C. WILSON, JJ., JOIN THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**